**IN THE UNITED STATES DISTRICT COURT FOR
EASTERN SECTION OF TENNESSEE**

TOKERS, INC., and
LORI NANNEY,

     Plaintiffs,

v.                                       Civil Action No.: _____
                                           **JURY DEMANDED**

COMMERCE GROUP, INC.,
WEST 2 EAST LAND, L.P.,
WEST 2 EAST LAND GP, LLC,
MARTIN O'BOYLE and WILLIAM RING,
And THE CITY OF ALCOA POLICE DEPARTMENT,
CITY OF ALCOA,

     Defendants, as well as all other defendants that conspired to violate Plaintiffs civil rights

not yet known.

<u>**COMPLAINT**</u>

     Comes now the Plaintiffs, by and through counsel, and for the Plaintiffs' Complaint for

damages against the Defendants, both jointly and severally, would state to this Honorable Court

the following:

**PARTIES**

1. Plaintiff, Tokers, Inc., was formed by owner, Lori Nanney (hereinafter "Mrs. Nanney"),

   and is registered in good standing with the Tennessee Secretary of State as a for profit

   Tennessee Corporation.

2. Plaintiff, Lori Nanney, is a resident of Blount County, Tennessee.

3. Commerce Group, Inc. is a Florida Corporation with its principal office located at 1280

   West Newport Center Drive, Deerfield Beach, Florida 33442, and can be served through

the registered agent, Martin O'Boyle, 23 N. Hidden Harbor Drive, Gulfstream, Florida 3348.

4. West 2 East Land, L.P. is a West Virginia Limited Partnership and is also registered as a Tennessee Foreign Company and can be served C T Corporation System, 300 Montvue Road, Knoxville, Tennessee 37919-5546.

5. West 2 East Land GP, L.L.C., is listed as the General Partner for West 2 East Land, L.P. and is a West Virginia Limited Liability Company and can be served through its registered agent, Myron Vaughan, 235 Todd Lane, White Sulphur Springs, West Virginia 24986.

6. Defendant, Martin O'Boyle, is upon information and belief, a resident of Florida.

7. Defendant, William Ring, is upon information and belief, a resident of Florida.

8. Defendant, The City of Alcoa Police Department is a municipal police department located in the City of Alcoa within the bounds of Blount County, Tennessee and can be served through its Chief Executive Office, The Honorable Mayor Tanya Martin or Chief David Carswell.

9. Defendant, City of Alcoa, may be served through its Chief Executive, The Hon. Mayor Tanya Martin. The City of Alcoa is a municipality located within the jurisdictional bounds of Blount County, Tennessee.

10. All other defendants not yet known refers to others, whether individuals, entities or government employees who may have joined in on the unlawful conspiracy/conduct to violate civil rights as set forth herein.

## JURISDICTION AND VENUE

11. Jurisdiction and venue are proper before this Honorable Court as the parties herein are completely diverse and the amount in controversy herein exceeds $75,000.

12. Jurisdiction and venue are further proper before this Honorable Court pursuant to 28 U.S.C. § 1332.

13. This Honorable Court has supplemental jurisdiction over the state law claims herein pursuant to 28 U.S.C. 1367.

## FACTUAL BACKGROUND

14. On December 20, 2018, President Trump signed into law the Agriculture Improvement Act of 2018, Pub. L. 115-334 (2018 Farm Bill). The 2018 Farm Bill removed hemp from the definition of marijuana in the Controlled Substances Act (CSA)[1] and directed the establishment of a regulatory framework for the legal production of hemp.

15. The 2018 Farm Bill defines "hemp" as the plant Cannabis sativa L. and any part of the plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol (THC) concentration of not more than 0.3 percent on a dry weight basis.[2]

16. On April, 24 2023, *ReportLinker* published the "CBD Oil and CBD Consumer Health Global Market Report," in which it predicted that CBD oil and CBD consumer health market is expected to grow from $39.54 billion in 2022 to $49.72 billion in 2023 at a

---

[1] The term "marijuana" is defined in the Controlled Substances Act at 21 U.S.C. § 802(16), as amended by section 12619 of the 2018 Farm Bill. Also, "marihuana" refers to the currently used term "marijuana."
[2] Section 10113 of The 2018 Farm Bill defines "hemp" more broadly that the 2014 Farm Bill defined "industrial hemp," thus eliminating any question that both the plants and products derived from the plants are legal, so long as the THC concentration does not exceed 0.3 percent on a dry wight basis. 2018 Farm Bill § 10113, codified at 7 U.S.C. § 1639o1. Included within the definition of hemp in the 2018 Farm Bill is cannabidiol (CBD), a cannabinoid that is a compound extracted from the cannabis plant with a delta-9 THC concentration of not more than 0.3 percent on a dry weight basis.

compound annal growth rate (CAGR) of 25.75%.

https://www.Reportlinker.com/p06451212/?utm_source+GMW.

17. Co-Plaintiff, Mrs. Nanney, was born with one arm and has undergone two spinal cord fusions. Due to her condition, she suffers debilitating migraine headaches and was told that CBD could help her with pain management. However, upon further research, she discovered most of the retailers that were selling CBD in Tennessee sold products that also contained potentially harmful chemicals and she felt there was a need for a store that only contained the best CBD products without all the harmful chemicals, hence the idea of Toker's was formed.

18. Although Mrs. Nanney had ran her ex-husband's crane operation business, this was her first business, and on March 19, 2021, Mrs. Nanney registered Toker's Inc. with the Tennessee Secretary of State.

19. The New Midland Plaza (hereinafter, "Midland Plaza") is a 365,000 sq. ft. multi-use commercial property located in Blount County, Tennessee, 232 South Calderwood Street, Alcoa, Tennessee 37701. West 2 East Land G.P., L.L.C. and West 2 East Land L.P., (hereinafter collectively "Landlord").

20. The Midland Plaza constitutes two separate shell buildings.

https://newmidlandplaza.com.

21. Defendant, West 2 East Land Group, L.L.C. (hereinafter "West L.L.C.") is a West Virginia limited liability corporation and is classified under NAIC code 5313 - Real Estate and Rental and Leasing – Real Estate-Activities Related to Real Estate (property mgrs., appraisers…etc.). West L.L.C. is not registered in Tennessee as a foreign company.

22. Defendant, West 2 East Land, L.P. (hereinafter "West L.P.") is a West Virginia limited partnership classified under industry group NAIC 5311- Real Estate and Leasing- Real Estate – Lessors of Real Estate (residential buildings & dwellings, mini warehouses, self-storage units, other).  West L.P. is registered as a Tennessee Foreign Company.

23. In violation of the Tennessee Consumer Protection Act (TCPA), Midland Plaza's website advertises that it is the "home to customer favorites, such as City Farms Wine & Spirits, Patterson's Home Appliances, Subs and Such, The UPS Store, New Midland Self Storage" and that the "day-to-day management of the Midland Plaza is performed by CRO Realty."  **https://newmidlandplaza.com/about**.

24. City Farms Wine & Spirits (hereinafter "CFW&S") advertises that CFW&S is a "family and women-owned business, Sheila and her three daughters started City Farms with the understanding that the community will always be the heart of the business.  For these strong Southern women, bringing City Farms to the Midland Plaza adds value to the community while giving locals a place to gather and celebrate with loved ones over something' special." "Sheila" does not mention that she is married to Mr. O'Boyle and that she does not live in Tennessee.  **https://cityfarmsalcoa.com/about-us/.**

25. CFW&S is a Tennessee Limited Liability Company with a mailing address of 1280 W. Newport Center Drive, Deerfield Beach, Florida 33442-7733.

26. New Midland Plaza Storage L.L.C. is also owned and operated by Mr. O'Boyle. Mr. O'Boyle, upon information and belief, had undocumented immigrants sleep in the storage units while resurfacing the asphalt and doing other maintenance work on Midland Plaza.

27. CRO Realty is registered in Tennessee as a Pennsylvania foreign corporation, however, the Tennessee Commerce and Insurance online license search does not show that CRO Reality has the required real estate license in Tennessee to conduct real estate business as advertised. **https://search.cloud.commerce.tn.gov/search?keyword=CRO%20Realty**.

28. In Tennessee it is misleading or untruthful advertising, including the use of the term "Realtor™," by a person not authorized to do so, or using any other trade name or insignia or membership in any real estate association or organization, of which the licensee is not a member. **https://www.tn.gov/commerce/regboards/trec/consumer-resources/file-a-complaint.html**.

29. On January 25, 2021, *The Daily Times*, wrote an article that stated that, "Developers are investing about $2 million to spruce up Alcoa's New Midland Plaza in 2021, and further "Florida-based Commerce Group plans to add multiple new businesses to its South Calderwood Street property, according to company leaders, so it's splitting up land into small parcels close to the road and behind the main-strip of businesses." **Exhibit A**.

30. On April 12, 2021, Stephen Bade (hereinafter "Mr. Bade") of Commerce Group emailed Mrs. Nanney an LOI. **Exhibit B**.

31. Mr. O'Boyle is listed as a director and officer of The Commerce Group which advertises itself as a Property Management company '"One Stop Shop' Real Estate Services.'' **About Us – Commerce Group – Commerce Group (commerce-group.com)**.

32. The Commerce Group is not registered in Tennessee as a foreign entity nor does Commerce Group have a Tennessee real estate license. **https://search.cloud.commerce.tn.gov/search?keyword=Commerce%20Group**.

In Tennessee, a business entity offering real estate brokerage services to the public typically must register with the real estate commission before conducting business activity.

33. However, it was Commerce Group that provided Mrs. Nanney the leasing package for Midland Plaza and negotiated the Letter of Intent (LOI) between Tokers and the "Landlord." The signature block for the LOI sets forth the following, in pertinent part:

By: WEST 2 EAST LAND LP
     By: WEST 2 EAST LAND GP, LLC, general partner

By: _____
          Martin E. O'Boyle, Managing Member

**Collective Exhibit B.**

34. Mr. Ring is a licensed Florida attorney, Bar #961795. The Florida Bar lists Mr. Ring's contact information as follows:

Commerce Group
1280 W Newport Center Dr
Deerfield Beach, FL 33442-7733
Office: 954-570-3510
Cell: 954-328-4383
Fax: 954-360-0807
wring@commerce-group.com

**Exhibit C.**

35. Mr. Ring never told Mrs. Nanney he was an attorney, let alone that he was the Landlord's attorney, and in fact his signature block states the following;

William Ring
Real Estate and Development
Commerce Group
1280 West Newport Center Drive
Deerfield Beach, FL 33442

36. Mr. Ring sent the lease to Mrs. Nanney that was purportedly "prepared by Suze Courtney our general counsel." **Exhibit D**.

37. However, sometime after signing the lease, Mrs. Nanney was told to only communicate through Mr. Ring because he was his legal counsel and he switched to signing letters as the "In-House Counsel" of the Commerce Group. **Collective Exhibit E**.

38. On April 8, 2021, Stephen Bade, (hereinafter "Mr. Bade"), emailed the following;

> "Despite our differences, I feel that our conversation yesterday was productive. I would encourage to call Gary and go inside the former Angel Nails space because I think it would be a good fit for your business, if you like the space and it works for you then we can talk numbers again and see if there is a deal to be made."

**Exhibit F**.

39. On April 12, 2021, Mrs. Nanney signed a Letter of Intent (LOI), Mr. Ring signed as "Authorized Officer for General Partner".

40. On April 29, 2021, not knowing that Commerce Group was also owned by Mr. O'Boyle, and believing Commerce Group was a third-party property manager, Mrs. Nanney asked Gary Woodward (hereinafter "Mr. Woodward") of Commerce Group if he could look over the lease and if "all looks good?" **Exhibit F**.

41. Mr. Woodward was a licensed real estate broker in Florida, however, his licensed expired on September 30, 2016, and he is not, nor has he ever been, licensed in Tennessee.

42. The online site, LoopNet lists the Commerce Group as the contact for leasing a space

in Midland Plaza.   **https://www.loopnet.com/Listing/126-256-s-Calderwood-St-Alcoa-TN/12125829/**.  On the site the visitor can also download two different sales brochures, one for "Prime Retail Space Available" and the other advertises spaces to lease in a purported new building that is being built, "New Retail / Shop / Garage Space".  **Collective Exhibit G**.

43. Tokers entered into a lease agreement.  **Exhibit H**.

44. Tokers has never received a fully executed lease from the Defendants despite multiple phone calls and email requests.

45. Tokers spent over $125,000 for tenant improvements and opened for business on June 4, 2021.

46. The Landlord knew the roof was leaking and needed to be replaced, that the water damage from the roof leaking had caused mold to develop and this part of Midland Plaza had a rodent and cock roach infestation.  **Exhibit I**.

47. The Landlord also knew that the roof top air conditioner needed replaced and was leaking because they had installed an in-wall air conditioner unit for the last tenants.

48. Sometime later Tokers started noticing water spots on the roof tiles, water dripping down the walls and would have to use a bucket to collect the water.  The water would also attract cock roaches.

49. The Landlord would refer to § 4.01, "Repairs" of the lease agreement states the following:

> "Tenant shall, throughout the Term of this lease and at its sole cost and expense, take good care of the Demised Premises and its appurtenances and keep them in good order condition and repair in compliance . . . whether such

repairs be interior or exterior, structural or non-structural, ordinary or extraordinary, foreseen or unforeseen."

**Exhibit H**.

50. However, even if this clause could be held up "Both parties agree that tenant is not responsible for the roof, windows, exterior walls, or sidewalk. Tenant will keep everything clean and neat, inside and out." **Exhibit H**.

51. Tokers' sales includes edible products and the employees of Tokers started to notice roaches and rodent droppings. Tokers had to spend thousands of dollars to by plastic wrapping and it was discovered that roaches and rodents were coming into Toker's lease space from the roof.

52. To make matters worse, the plumbing was never fixed properly and the bathroom located in Tokers became unusable.

53. Mrs. Nanney requested the Landlords cure these material breaches of the lease multiple times. Despite Toker's requests, the Landlord never remedied the health and safety issues.

54. Despite these poor tenant conditions, Toker's was doing great and had sales of well over one hundred thousand per month and had built up a loyal clientele with Tokers unique business model of having knowledgeable sales persons and only the best CBD products available.

55. Due to Toker's success and the maintenance issues with the current space Ms. Nanney attempted to work with both Mr. O'Boyle and Mr. Ring to move Tokers to a larger location in Midland Plaza[3] which was also located in the first section, which had

---

[3] As is noted throughout this Complaint, at all relevant times Mrs. Nanney wanted to keep the Toker's location a Midland Plaza due to the success she was having there. The deplorable conditions, failure to the landlord to repair

already had the roof replaced.  However, the proposal was for $8,000/month and Mrs. Nanney rejected the offer.

56. Upon information and belief, multiple tenants have abandoned their lease due to maintenance issues including TTJC Karate.

57. Mr. O'Boyle built a bedroom that is connected to New Midland Storage's office which has a bathroom and break area and when he would come to Tennessee, he would stay at the make shift apartment.

58. In 2022, Mr. O'Boyle also started to make inappropriate and sexual comments to Toker's employees including trying to trap a female employee in his bedroom.

59. Shortly after Ms. Nanney rejected Mr. O'Boyle's offer regarding Tokers possible relocation, Mr. O'Boyle ordered products from Tokers and requested that a particular female employee[4] bring the order to his apartment.  When the female employee did not return right away and did not answer her phone, Ms. Nanney went to Mr. O'Boyle's apartment and saw the employee trying to escape Mr. O'Boyle's bedroom.  The employee had her hands on him and was trying to push him off her.  Mrs. Nanney immediately got between the employee and Mr. O'Boyle.  Mrs. Nanney reported this incident to Mr. Ring.

60. When Mr. O'Boyle was in Tennessee he would come into Tokers, when Mrs. Nanney was not there and harass the employees.  On one visit, two female employees were sitting on a bench rolling CBD joints[5] when Mr. O'Boyle came in and squeezed himself in

---

items that would allow Toker's to properly operate and failure to find Ms. Nanney another location at Midland Plaza in the section of the strip center where the roof had been replaced, made keeping this location untenable.
[4] Mr. O'Boyle would call the Toker's employee his, "future wife."  The employee is fearful of being named and wishes to stay anonymous at this time.
[5] CBD has been touted for a wide variety of health issues, but the strongest scientific evidence is for its effectiveness in treating some of the cruelest childhood epilepsy syndromes, such as Dravet syndrome and Lennox-Gastaut Syndrome (LGS), which typically don't respond to antiseizure medications.

between them and made inappropriate comments regarding one of the employee's tattoos located on her thigh, calling her a "nasty girl" and that he would be "keeping an eye on her" and she should behave." Mr. Ring was also present at many of these visits

61. Tokers was the only space that was opened late at that end of Midland Plaza and Mr. O'Boyle when in town started parking his vehicle with his lights on facing Tokers. The female employees became scared of Mr. O'Boyle and wanted Mrs. Nanney to confront Mr. O'Boyle and get him to stop the harassing and intimidating behavior.

62. Mrs. Nanney also became close to Mr. O'Boyle's office manager and Mr. O'Boyle's proclivities did not stop with Toker's employees but extended to his own employees such as purportedly requesting that his ex-office manager and her boyfriend have a "threesome" with him.

63. On October 5, 2022, Mrs. Nanney met with Mr. O'Boyle and confronted him about his behavior so he said he would give her 30 days to find a new location, however, he would release Toker's from any obligations under the lease despite the fact that Mrs. Nanney did not agree to this unilateral decision. Mr. Ring then emailed Mrs. Nanney a document entitled, "First Amendment to Agreement of Lease" to sign, which had Tokers having to vacate their lease within 90 days and giving up their rights. **Exhibit J**.

64. The New Midland Plaza is located in the City of Alcoa and the current chief of the City of Alcoa Police Department (hereinafter, "APD") is Chief David Carswell.

65. On Thursday, October 13, 2022, the APD and the Alcoa Fire Department partnered together to celebrate, Community Day National Night Out. The festival was held in the New Midland Plaza's parking lot.

66. According to National Night Out, it is an annual community-building campaign that

promotes police-community partnerships and neighborhood camaraderie to make neighborhoods safer, more caring places to live. National Night Out enhances the relationship between neighbors and law enforcement while bringing back a true sense of community. Furthermore, it provides a great opportunity to bring police and neighbors together under positive circumstances. Https://natwo.org/about/.

66. Tokers never had an issue with APD or for that fact Blount County Sheriff's Office (hereinafter "BCSO") before Midland Plaza hosted the National Night Out.

67. However, on Friday, October 14, 2022, the APD under the color of law saturated Midland Plaza's parking lot and starting around 7PM at night, Tokers would close at 9PM on Fridays, a strong law enforcement presence started to develop in the parking lot of Midland Plaza and as closing time became closer and closer additional APD officers showed up and they would take turns with two or three of them circling the smaller parking area in front of Tokers.

68. In the following weeks and months there was a very strong police presence monitoring the Tokers location and harassing both Toker's employees and customers. Some of the incidences included, but were not limited to, the following:

a. A customer of Tokers left the store and was headed to his house and while still in the parking lot of Midland Plaza was illegally stopped by an APD officer. The APD officer had his name tag covered by his radio microphone. When the customer asked why he was pulled over the officer questioned if he was leaving Tokers, the customer told him that he was and the officer responded by saying he had reason to believe the customer was in possession of illegal substances and the customer held the bag from Tokers up and asked if the officer meant what he had purchased from Tokers was illegal

and the officer responded by requesting the customer get out of the car and the customer told him that he needed to call his supervisor the officer went back to his parole car and left.

     b. Another incident and harassment occurred when a female employee of Tokers was walking to her parked vehicle after closing and two APD cruisers were parked on both sides of a vehicle when the rest of the parking lot was empty.

     c. On yet another occasion two customers were followed by two separate APD cruisers from Midland Plaza's parking lot one all the way to the Knox County line on Highway 129.

     d. Yet another incident was when an employee left Tokers after closing and the employee was followed by an APD officer all the way from the New Midland Plazza parking lot to being within eyesight of his home.

69. Upon information and belief these incidents of police harassment and intimidation were done on behalf of Mr. O'Boyle directly or through another un-known co-conspirator.

70. On October 16, 2022, due to the continuous harassment conduct by both Mr. O'Boyle and APD, Mrs. Nanney emailed Mr. Ring stating she was looking for a new location and would move as soon as she was able to secure a location and requested that Mr. O'Boyle stop waiting outside for her female employees. **Exhibit K**.

71. On October 17, 2022, Mr. Ring emailed Mrs. Nanney stating it "appears you are upset. I will be at NMP tomorrow (flying in tonight). I will be there all week and probably thru the weekend." **Exhibit L**.

72. Mrs. Nanney also became very scared of both Mr. O'Boyle and APD and on

November 22, 2022, Mrs. Nanney email Mr. Ring the following;

> "I will sign this first amendment. I do need a copy of it back by the end of the day today if he does not sign this, I will definitely be seeking an attorney with several lawsuits. First of them sexual discrimination against my employees. Thursday, January 5 would be 90 days from the date that I received this notification. If we are supposed to be out a different date, please let me know."

**Exhibit M**.

73. However, on November 22, 2022, Mrs. Nanney and Mr. Ring had a phone discussion in which Mrs. Nanney recorded. Mrs. Nanney explained to Mr. Ring that she could not pay the entire amount of the lease and be out in ninety days. **Exhibit N**.

74. Mr. Ring told her that she would have to pay for the entire lease in order to be able to leave, Mrs. Nanney, could not agree to do that so she revoked her agreement that she would be able to move.

75. Tokers despite the health and safety issues, the on-going harassment and intimidation by Mr. O'Boyle, APD, and unknown co-conspirators was very successful bringing in over $100,000 in sales per month and Mrs. Nanney wanted to expand her concept throughout Tennessee.

76. In order to expand, Mrs. Nanney joint ventured the project with a friend to open the Morristown, Tennessee Toker's location. The second location is located at 463 Crockett Trace Dr. Suite 6, Morristown, TN 37813.

77. Mrs. Nanney also signed a lease to open a third Tokers in Brown's Creek Shopping Center, Blount County, Tennessee and hired Marty Yates Builders, Inc., paying an initial $10,000 deposit on December 7, 2022.

78. Tokers hired Attorney Daniel Herrera who wrote a letter dated March 8, 2023 to the

Landlords regarding the roaches, maintenance and continuing sexual harassment of her employees and demanded to be let Tokers out of the lease.  **Exhibit O**.

79. Mrs. Nanney also continued to look for a new location in the City of Alcoa.

80. On April 25, 2023, as a result of the continuing harassment and intimidation by both the Landlords and APD harassing Tokers employees and customers underlying counsel sent a "Cease and Desist, Litigation Hold and Preservation of Evidence letter to Alcoa Police Department, Chief David Carswell and the Blount County Sheriff, Sheriff James L. Berrong.  **Exhibit P**.

81. Mrs. Nanney also became afraid for herself and installed a security system at her home.

82. Mrs. Nanney felt that they had no choice but to abandoned the Toker's Alcoa, TN location.

83. Mrs. Nanney continues her search for a new location in Alcoa and moved her employees from Midland Plaza to working at the Maryville location.

## CLAIMS FOR RELIEF

### COUNT I – BREACH OF CONTRACT- CONSTRUCTIVE EVICTION.

84. The Plaintiffs incorporate by reference all previous paragraphs above in Support of Count I.

85. At all relevant times herein, the parties operated under a purported commercial lease agreement.

86. Plaintiff performed its obligations under the terms of the lease in good faith. The Defendants failed to perform their end of the bargain and acted in bad faith.

87. Plaintiff advised the Defendants on several occasions that the roach, mold and sexual harassment matters needed to be addressed immediately. Defendants were placed on actual notice of the same and did nothing to correct its unlawful conduct.

88. Further. the continuous sexual harassment of Toker's employees, the harassment by by both Messrs. Ring and O'Boyle, resulted in Tokers being forced to close under constructive eviction.

89. Defendants breach of contract has caused the Plaintiff damages including loss profits from the Alcoa Tokers location for the time it was forced to close until the end of the lease term.

90. At all times relevant, Ms. Nanney intended to keep the Toker's location at New Midland Plaza because the location was doing quite well prior to the unlawful conduct by the Defendants set forth herein. As a result of being forced out of this location Ms. Nanney has suffered hundreds of thousands of dollars in lost revenues and profits.

## COUNT II: BREACH OF CONTRACT.

91. The Plaintiffs incorporate all preceding paragraphs in support of Count II.

92. At all relevant times herein, the parties operated under a commercial lease agreement.

93. Plaintiffs performed their obligations under the terms of the lease in good faith. The Defendants failed to perform their end of the bargain and acted in bad faith.

94. Plaintiff advised the Defendants on several occasions that the roach, mold and sexual harassment matters needed to be addressed immediately as it was affecting the mental wellbeing of Toker's employees, scared clientele and resulted in the business to start

losing sales. Defendants were placed on actual notice of the same and took no remedial action to correct its unlawful conduct.

95. Moreover, the continuous sexual harassment of Toker's employees, the harassment by the Alcoa Police Department of both employees, its clientele, and the constant threats by both Messrs. Ring and O'Boyle resulted in Tokers being forced to seek another commercial lease to move in to in order to mitigate its ongoing damages thereby losing a location (New Midland Plaza) that they wished to keep open. Defendants unlawful conduct set forth herein made it untenable for Tokers to stay at New Midland Plaza.

96. Defendants unlawful conduct constitutes the breach of the Plaintiff's right to quiet enjoyment of its leasehold. Indeed, the Landlord breached the covenant of quiet enjoyment, which every tenant to a commercial lease in Tennessee enjoys by operation of law, by failing to make repairs to the tenant's premises where the lease requires the landlord to do so.

97. Plaintiffs performed their duties under the lease; however, Defendants woefully failed to uphold their end of the bargain and thereby breached the contract with the Plaintiffs.

98. Defendants breach of contract has caused the Plaintiff hundreds of thousands of dollars in damages.

**COUNT III – VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT.**

99. The Plaintiff, Lori Nanney, restates all paragraphs herein in support of Count III.

100. At all times material hereto, the Plaintiff was advised by and relied on the Defendant being licensed to conduct a commercial rental management company in Tennessee.

101. The Plaintiff executed her lease because she believed that the services the Defendants were providing as a commercial rental management company were legitimate and authorized by Tennessee.

102. Had the Plaintiff known that the Defendants were operating its commercial rental management company in Tennessee unlawfully, Plaintiff would have rented from another landlord in a different location.

103. Defendants unlawful conduct was deceptive as at all times relevant it held itself out as a rental management company properly licensed to do same in Tennessee.

104. Defendants held themselves out to be highly skilled in the commercial rentals with years of experience with exceptional tenant care yet the Defendants ignored Mrs. Nanney's request to cease and desist the sexual harassment and assaults and to remedy the cock roach and mold problems in the leasehold.

105. Had the Defendants not acted deceptively, Ms. Nanney would not have executed a lease with them and would have sought a different location and landlord to work with as she at all relevant times intended to keep that location open and therefore, she would not have been damaged as set forth herein.

106. As a direct result of the Defendants', O'Boyle and Ring, deceptive acts Mrs. Nanney has suffered damages, attorney's fees and expenses and costs.

**COUNT IV – NEGLIGENT MISREPRESENTATION.**

107. The Plaintiffs restate all paragraphs herein in support of Count IV.

108. Defendants owed the Plaintiffs a duty of care to explain to them the actual status of their business license to conduct rental management in Tennessee.

109. Defendants failed in its duty to advise the Plaintiffs of material facts surrounding its

business license in Tennessee.

110. Had Defendants not failed in its duty to disclose material information as to its license the Plaintiff would not have entered into a lease with them.

111. As a result of the Defendants negligence the Plaintiff was damaged by having to move her entire business from Midland Plaza to a new location.

112. The Defendants negligent conduct is, in part, the direct and proximate cause of the Plaintiffs' damages.

## COUNT V - MENTAL AND EMOTIONAL ANGUISH.

113. The Plaintiffs restate all paragraphs herein in support of Count V.

114. Defendant O'Boyle's conduct exacted upon Ms. Nanney, her employees and her clients while renting the Midland Plaza location has caused Ms. Nanney severe mental and emotional anguish manifesting itself by nausea, sleepless nights

115. Ms. Nanney, on a daily basis, remains in fear of Mr. O'Boyle due to his unlawful conduct and has even had to purchase outdoor security cameras for her home due to the conduct and threats of Mr. O'Boyle.

116. As a direct result of the mental and emotional anguish caused by Mr. O'Boyle, Ms. Nanney suffers from sleepless nights, nausea, anxiety, mental anguish, humiliation and loss of appetite, to name just a few manifestations, as a result of Mr. O'Boyle's unlawful conduct.

## COUNT VI – VIOLATION OF 42 U.S.C. § 1983.

117. The Plaintiffs restate all paragraphs herein in support of Count VI.

118. Upon information and belief, based on the averments set forth herein and below, the Defendants sought the assistance of the City of Alcoa and the City Alcoa Police

Department, so that they could harass and intimidate the Plaintiffs, as a result of Plaintiffs' voicing concern over Mr. O'Boyle's unlawful conduct.

119. After the incident with Mr. O'Boyle trapping a Tokers employee in his apartment, which is in the commercial building in Midland Plaza, the Alcoa Police Department began a campaign of harassing and intimidating Tokers' employees and clientele.

120. As a result of the harassment and intimidation by a state actor, i.e., the Alcoa Police Department, upon information and belief, Messrs. O'Boyle and Ring requested them to do so to run Tokers out of its commercial lease space.

121. Upon information and belief, the conspiracy between Messrs. O'Boyle and Ring and the Alcoa Police Department, which is a department of the City of Alcoa, under the supervision of the Alcoa Mayor, to violate the Plaintiffs civil rights and damage their personal property interests, the Plaintiffs has lost hundreds of thousands of dollars.

**COUNT VII – CONSPIRACY TO VIOLATE 42 U.S.C. § 1983**

122. The Plaintiffs restate all paragraphs herein in support of Count VII.

123. Upon information and belief, Messrs. O'Boyle and Ring after being rejected by the Plaintiffs, conspired with the Alcoa Police Department to retaliate against the Plaintiffs and force them out.

124. More specifically, prior to the conflict with Mr. O'Boyle trapping one of its employees in his apartment at Midland Plaza, the Alcoa Police Department began a campaign of buzzing Tokers' store, driving by constantly, harassing clientele that were leaving Tokers that had purchased legal products under both state and federal

law, i.e., The Farm Act, to the point that Tokers began losing clientele because they were in fear of being targeted by the Alcoa Police Department.

125. As a result of the conspiracy to violate the Plaintiffs civil rights the Defendants conspired to force the Plaintiffs out of the commercial space at Midland Plaza and by their unlawful actions made Tokers' ability to stay and continue to make money at Midland Plaza untenable.

126. As a direct result of the Defendants' conspiracy to violate 42 U.S.C. § 1983, the Plaintiffs' federal constitutional rights were violated under color of law with state actors, which in turn caused the Plaintiffs hundreds of thousands of dollars in lost revenue/profits and caused mental and emotional anguish to Ms. Nanney of which she sees a medical professional for.

**WHEREFORE, PREMISES CONSIDERED, PLAINTIFFS, PRAY FOR A JUDGMENT AGAINST THE DEFENDANTS, BOTH JOINTLY AND SEVERALLY, IN THE AMOUNT OF $5,000,000, PLUS PLAINTIFFS' REASONABLE ATTORNEY'S FEES, PUNITIVE DAMAGES TO BE ASSESSED BY THE COURT AND EXPENSES AND COSTS.**

Respectfully submitted,

s/Russ Egli
Russ Egli, BPR#24408
The Egli Law Firm
Attorney for the Plaintiffs
11109 Lake Ridge Drive, FL3
Knoxville, TN 37934
865-304-4125
F: 855-827-0624
theeglilawfirm@gmail.com

s/Joe Smith
Joe Smith, BPR#39016

Greenstreet Law, P.C.
11109 Lake Ridge Drive, FL2
Knoxville, TN 37934
770-654-2358
joe@greenstreetlaw.com
*Pro Hac Vice Pending*

*Attorneys for the Plaintiffs*